**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| MICHAEL DELUZIO and JANE EVANS, | : | Civil Action |
| | : | No. 06-6220 (FLW) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | **OPINION** |
| | : | |
| FAMILY GUIDANCE CENTER OF WARREN | : | |
| COUNTY, | : | |
| | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**WOLFSON, District Judge**:

This matter comes before the Court on a motion for summary judgment filed by Defendant the Family Guidance Center of Warren County ("Defendant" or "Family Center"). Plaintiff Jane Evans ("Plaintiff" or "Evans")[1] filed a three-count Complaint against Defendant, her employer, claiming discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et.</u> <u>seq</u>, based upon gender discrimination, reverse race discrimination,

_____

[1]     Michael DeLuzio ("DeLuzio") was a former co-worker of Plaintiff.  He was also a Plaintiff in the present matter. DeLuzio, however, was previously dismissed from the case by the Court because he failed to file his Complaint within 90-days after receiving his Right-to-Sue letter from the EEOC.  <u>See</u> Order dated October 10, 2007.  Consequently, this Opinion solely focuses on Evans' claims against the Family Center; to the extent the Court mentions DeLuzio in this Opinion, it is for the purpose of providing a complete factual background.

and retaliation.  For the reasons that follow, Defendant's motion for summary judgment on all counts is granted.

BACKGROUND

Plaintiff is a Caucasian female who initially worked at the Family Center as a crisis clinician.  See Defendant Family Guidance Center of Warren County's L. Civ. R. 56.1 Statement of Material Facts Not in Dispute at ¶ 32, ("Def. Facts").  Subsequently, on December 17, 2000, she began working at the crisis intervention unit ("CIU") at the Family Center under the direct supervision of Laurie Boehm ("Boehm").  See Id. at ¶ 34.  She worked in this capacity for approximately one year before she was reassigned to the Family Crisis Intervention Unit ("FCIU"), where she served as a counselor for children and families.  Id. at ¶¶ 35, 36.

The Family Center was formed to improve the quality of life for children and adults who are affected "by problems related to mental illness, substance abuse, family conflict or emotional adjustment."  See Id. at ¶ 1.  Defendant's authority "rests with its Board of Trustees, Executive Director and Medical Director."  See Id. at ¶ 3.  These bodies each oversee the function of the other.  Specifically, Defendant's Board of Directors oversees the functions of the Executive Director; the Executive Director, in turn, supervises the functions of the Director of Program Services and other employees of the Family Center.  Id. at ¶ 4.  The Director of Program Services is mainly responsible for the "overall

coordination of service delivery" and additionally provides "administrative and clinical supervision and consultation to the program directors." Id. at ¶ 5. The Director of Program Services is also the immediate supervisor of the Family Center's Coordinator of crisis services, emergency/screening services, and family court crisis team. Id. at ¶ 6.[2]

Howard Grossman ("Grossman") served as the Family Center's Executive Director from in or about December 2003, until his resignation in March 2006. See Id. at ¶ 8.[3] William Stover ("Stover") served as "Interim Executive Director" from in or about March 2006 through Plaintiff's resignation on April 10, 2006. Id. at ¶ 9.[4]

Boehm served as the Family Center's "Director of Program Services" at all times relevant to the present case. Id. at ¶ 10. Boehm was Plaintiff's initial supervisor in the CIU, however, she

---

[2]   The primary responsibility of the Program Coordinator is to "ensure the coordination of [the] program's clinical and administrative functioning with other [Center] programs and outside agencies, and supervise program staff." See Def. Facts at ¶ 7.

[3]   Plaintiff contends that Grossman's resignation was actually "in lieu" of termination by the Center's Board of Trustees ("the Board of Trustees"). See Pl. Counterstatement of Material Facts at ¶ 8. According to Plaintiff, the Board gave Grossman the option to resign, or otherwise be fired, due to numerous complaints filed against him. See Id.

[4]   Stover additionally served as the Center's "Coordinator of Outpatient Services" prior to March 2006. See Pl. Counterstatement at ¶ 9.

later became Plaintiff's acting supervisor in FCIU until February 2005. Id. at ¶ 37. During this relevant period of time, Plaintiff did not file complaints regarding Boehm's supervision. Id. at ¶ 39. Michelle Scrubb ("Scrubb"), of African American descent, was employed as the Family Center's "Coordinator" of crisis services from February 2005 through Plaintiff's resignation in April 2006. Id. at ¶¶ 11, 40. Scrubb, as "Coordinator of Crisis Services", became Plaintiff's supervisor when Plaintiff was a CIU clinician; Scrubb was also Plaintiff's supervisor at the FCIU. See Id. at ¶ 41.

Plaintiff alleges that the first instance of condescension, and general "nasty" and prejudicial comments and behavior occurred when Scrubb became her supervisor in July / August 2005. See Pl. Counterstatement at ¶ 43. As part of her discrimination claim, Plaintiff alleges that on September 13, 2005, Scrubb spoke in a manner that was "unacceptable": Scrubb told Plaintiff and Plaintiff's Caucasian co-worker, DeLuzio, "that they were now until further notice required to provide mandatory on-call / back-up one (1) weekend day a month." Id. at ¶ 43. Likewise, DeLuzio reported that "in their first meeting Scrubb had an immediate distain [sic] for them, she was extremely condescending, belligerent, confrontational and acted as though she was unrestricted in how nasty she could treat them." Id. Scrubb's on-call directive allegedly resulted from the request of DeLuzio and Evans that

Scrubb inform them when Scrubb was planning to take vacation, and that Scrubb cancel any supervision meetings if she was not planning on attending.  Id.  It was after this request that Scrubb, the next day, allegedly retaliated against DeLuzio and Evans by mandating that they be on-call and / or perform back-up one weekend day per month.  Id.  Prior to this demand, both Plaintiff and DeLuzio were required to remain on-call for only two (2) holidays a year.  Id.

As a result of the meeting between Plaintiff, DeLuzio, and Scrubb, both Plaintiff and DeLuzio sought recourse from the Family Center.  See Pl. Counterstatement at ¶ 46.  Plaintiff spoke with a representative from Human Resources regarding the filing of a grievance.  Then, on October 5, 2005, both Plaintiff and DeLuzio met with Stover to discuss Scrubb's "condescending attitude, prejudice, nastiness and overall derogatory treatment" towards them.  Additionally, for the first time, they allegedly told Stover that Scrubb was harassing and discriminating against them, although no specificity was given.  See Def. Facts at ¶ 47; see also, Pl. Counterstatement at  ¶ 47.  Plaintiff told Stover that she and DeLuzio "were being treated different as a unit because only [their] unit was being treated [in that manner]."  See Def. Facts at ¶ 48.

Plaintiff purportedly sought the assistance of Stover, because she regarded him as "level-headed" and the "best option at the time . . . [of someone] . . . who would listen to [them] and try and

resolve" the issue.  See Id. at ¶ 49.  Evans' perception, however, was soon displaced as Plaintiff sensed that he did not remain "level headed . . . until the end of her employment."  See Pl. Counterstatement at ¶ 49.  Additionally, Plaintiff alleges that Stover began to discriminate against Plaintiff as well, because Stover did nothing to assist Plaintiff, but instead protected Scrubb.  Id.  Plaintiff, however, never filed a formal grievance against Stover.

A few weeks after the October 5, 2005 meeting with Stover, Plaintiff and DeLuzio jointly filed a formal grievance[5] against Scrubb.  See Def. Facts at ¶ 51.  In addition, for both "personal and professional" reasons, Plaintiff and DeLuzio wrote numerous letters and memoranda regarding the alleged discrimination.  Id. at ¶ 51.  The personal reasons, as described by Plaintiff, were "the discriminatory, harassing and retaliatory behavior" of Scrubb; the professional reasons "were due to [Scrubb's] incompetence as a coordinator for the CIU and FCIU."  See Pl. Counterstatement at ¶

---

[5]    The Family Center has a formal policy that delineates the method and manner in which a Center employee files a formal grievance.  It permits an employee to initiate a grievance with his / her supervisor.  If the supervisor's decision is deemed unsatisfactory, the employee may appeal to the Executive Director.  Decisions made by the Executive Director may be similarly appealed to the Board of Trustees.  The procedure, however, advises that an employee should not abuse the grievance policy by "'raising grievances in bad faith or solely for the purpose of delay or harassment,' and should not 'repeatedly file grievances that a reasonable person [finds] to have no merit'."  See Def. Facts at ¶ 54.

56.   These documents were discussed at meetings with supervisors from the Family Center.   Plaintiff, however, alleges that these grievances were not "taken seriously" as the Family Center's supervisors "only wanted to protect and shield Scrubb . . . [because] they wanted a minority supervisor to fill a quota." See Id. at ¶ 51.

On November 7, 2005, Plaintiff and DeLuzio met with Grossman (Executive Director) and Boehm (Director of Program Services) to discuss their grievance filed against Scrubb.   See Def. Facts at ¶ 59.   During this meeting, where Boehm took notes, DeLuzio allegedly made the following statements pertaining to Scrubb (quoted from Boehm's memorandum, dated December 15th):

(i)   "[S]he talks to me slowly and deliberately as you would to a child.   She is condescending and belittling."

(ii)  "She talked to me very, very fast and it was hard to understand what she was saying."

(iii)   "Her messages always come across very confusing and very rapid."

(iv)  "She contradicts herself over and over again."

(v)   "She said[,] 'I need those charts now!' and she clapped her hands for me to go get them and I felt that was disrespectful."

(vi)  "It's getting hard to be civil to her."

See Def. Facts at ¶ 63; see also, Hager Dec., Ex. 6.   Evans also informed those at the meeting that she had "seen Scrubb verbally beat the crap out of Mr. DeLuzio and that this made her feel extremely anxious and uncomfortable."   See Pl. Counterstatement at ¶ 63.   No action was taken as a result of this meeting.

After Evans and DeLuzio reported Scrubb's conduct to upper management, Scrubb allegedly retaliated with more confrontational behavior, through both verbal "lashing" (where she questioned why they met with Stover) and intense micromanaging. Id. at ¶ 64. Plaintiff further submits that Scrubb's treatment eventually worked to sabotage her and DeLuzio's work performance. Id. On November 7, 2005, as a result of Scrubb's reactions, and their general dissatisfaction with the meeting with Stover and Boehm, Plaintiff and DeLuzio requested to move to the next step of the grievance process. Id. at ¶ 67. In that connection, Plaintiff composed two (2) memoranda to Grossman. The first centered on the November 7th meeting with Scrubb and the second memo, dated December 14, 2005, "disclosed . . . specific background information in reference to CIU issues of concern that were of a systemic nature." See Def. Facts at ¶ 67(i)-(ii). Plaintiff described speaking with Grossman and relaying her frustration about working with Scrubb. Plaintiff noted to Grossman that "Scrubb was critical and non-supportive in the way she was reviewing their cases," made them "do things that others were not asked to do," and spoke with them "in a condescending manner." See Pl. Counterstatement at ¶ 68; see also, Plaintiff's Aff. ¶ 163.

Grossman investigated the allegations asserted against Scrubb. The results of this investigation were that Scrubb was a "supportive, honest, [and] professional" member of the Family

Center.  See Def. Facts at ¶ 69.  Plaintiff disagrees with this description of Scrubb's professional demeanor, and alleges that the findings of the investigation were part of a concerted effort to shield Scrubb from further reprisal.  See Pl. Counterstatement at ¶ 70.  Furthermore, Plaintiff avers that the investigation resulted in more pressure being placed on her and DeLuzio, not only from Scrubb but also from Boehm.  Plaintiff alleges that "new, ridiculous rules and regulations [were] implemented" which required Plaintiff and DeLuzio to "have several more cases reviewed at supervisions" and "document every 15 minutes of their day[,] including when they use[d] the bathroom."  See Id.

On December 16, 2005, the Family Center's Grievance Committee sent a memorandum to Plaintiff seeking clarification of her grievances and the relief being sought:

> . . . it was difficult to ascertain the exact nature of the grievance [against Scrubb], given the volume of the correspondence.  Therefore, we are requesting that you and Michael DeLuzio each submit separately a one-page summary of your specific grievance.  In that summary, we would also like clarity on what you would consider to be a satisfactory outcome.  After receiving your response, we will meet with each of you . . . the week of January 2.  Please submit your summary . . . by Friday, December 23.

See Def. Facts at ¶ 78.  Plaintiff submitted her response to the Grievance Committee on December 28, 2005.  In her response, Plaintiff did not outline any discriminatory conduct, but rather referenced Scrubb's "inappropriate verbal communication," "lack of competency," and "ethic violations."  See Memorandum dated December

28, 2005.  Plaintiff requested the Committee to take appropriate action to resolve her grievance, which she indicated should be that Scrubb either resign or be terminated by the Family Center.  Def. Facts at ¶ 80.

On January 9, 2006, Plaintiff and DeLuzio submitted another memorandum to Grossman regarding their weekly meetings with Boehm and Scrubb.  According to Defendants, Plaintiff and DeLuzio alleged "discrimination [and] harassment / sexual harassment in the workplace."  See Id. at ¶ 84.  Both Plaintiff and DeLuzio then met with Grossman on January 23, 2006; the meeting was held for the purpose of discussing the allegations of discrimination and sexual harassment.  Id. at ¶ 87.  At that meeting, Grossman asked Plaintiff to provide specific examples of discrimination; Plaintiff did not provide any details.  Id.  Plaintiff, however, avers that during this meeting both Grossman and Boehm acted in a "patronizing" manner; Grossman "visibly laughed" while Plaintiff "tried to explain different circumstances."  See Pl. Counterstatement at ¶ 87.  Plaintiff determined that Grossman and Boehm were "not taking them serious[ly]" and thus ceased providing information.  See Id.[6]  It is important to note that in this

---

[6]   Both Plaintiff and DeLuzio filed a grievance with the Center's Grievance Committee based on "Grossman and Boehm allegedly failing to address the allegations against Scrubb, and for 'not taking [them] seriously in meetings'."  See Def. Facts at ¶ 98.

meeting, Plaintiff also did not provide any details of any discrimination.

Subsequently, the Grievance Committee issued a written opinion on January 26, 2006, discussing Plaintiff and DeLuzio's grievance against Scrubb. The opinion made recommendations "to improve the working relationship between Scrubb, [Plaintiff,] and DeLuzio." See Id. at ¶ 94; see also Hager Dec., Ex. 37. The Grievance Committee's decision also declined to terminate Scrubb's employment with the Family Center. Id. The Grievance Committee did recommend that Scrubb undergo an assessment of her capabilities as a supervisor, particularly of this unit. Id. at ¶ 95. Finally, while the opinion did note the Grievance Committee's "appreciation" to Plaintiff and DeLuzio in raising their concerns, it advised that "[t]he 'constant memoranda campaign must come to a close'." Id.[7]

Plaintiff and DeLuzio then submitted to Grossman a memorandum on January 28, 2006, in response to the request for details regarding the alleged discrimination and harassment. Plaintiff has admitted that this memorandum did not contain any details about the allegations; instead the memorandum requested that Scrubb's and

---

[7]    Plaintiff and DeLuzio claim that the numerous memoranda were submitted in an honest effort to address their concerns, as these issues were allegedly not being considered by the Grievance Committee. See Pl. Counterstatement at ¶ 96. The Grievance Committee also informed Plaintiff and DeLuzio that they could not seek intervention from a third-party agency prior to the completion of the established grievance procedure of the Family Center. See The Grievance Committee's Memo dated January 26, 2006

Boehm's supervision meetings stop "until the discrimination/harassment issues can be resolved." <u>See</u> Def. Facts at ¶ 88; Plaintiff's Dep., 187-188.

On March 7, 2006, Plaintiff and DeLuzio submitted an additional memorandum to Grossman that claimed they were both facing increasing health concerns "due to unreasonable work demands [and] conditions." <u>Id.</u> at ¶ 99. While Defendant notes that this submission did not reference discrimination, but rather complained that Plaintiff's "workload was heavy," Plaintiff claims otherwise. <u>See Id.</u>; <u>see also</u>, Pl. Counterstatement at ¶ 99. Plaintiff explains that the "conditions" to which she referred in the document support that the "harassment and discrimination" took its "toll" by "negatively impacting on [her] health." <u>See</u> Def. Facts at ¶ 99. Grossman asked Plaintiff to provide further explanation of "why her workload was an issue" given that "objective statistics" suggested that her time was "being underutilized." <u>See Id.</u> at ¶ 101. Plaintiff did not respond to Grossman's request. <u>Id.</u> Instead, Plaintiff suggests that this is another example of "pure retaliation" and "an attempt to find [her] work substandard." <u>See</u> Pl. Counterstatement at ¶ 100.

Thereafter, Plaintiff and DeLuzio submitted five (5) additional memoranda to the Board of Directors of the Family Center, and / or to Grossman, regarding either a request to move towards the next stage of the grievance procedure or referencing a

particular concern.  See Hager Dec., Ex. 32 - 38.  A March 13, 2006 memorandum to Grossman referenced the January 23rd meeting as follows:

> . . . we clarified during the [January 23rd] meeting which you made light of, that we had mistakenly used an incorrect term "sexual harassment" in describing sex / gender discrimination / harassment pertaining to FCIU clinician Michael DeLuzio in reference to how he was treated by both Ms. Scrubb and Ms. Boehm.  Also, we discussed race discrimination pertaining to how Michelle Scrubb (who is black) would routinely treated [sic] us as lesser than [sic] . . . .  We discussed with you that if you needed clarification on how we were singled out and treated differently, all you needed to do was to refer to some of our previous memos to you, the Family Guidance Center's Grievance Committee and the Family Guidance Center Board of Trustees.

See Def. Facts at ¶ 90.  See also, Hager Dec., Ex. 35.  This memorandum also included references to prior memoranda, and details as to how both Grossman and Stover were discriminating against Plaintiff, as a woman.  See Pl. Counterstatement at ¶ 90; see also, Pl. Affidavit at ¶¶ 75-79.  In addition, the memorandum also referenced "reverse race discrimination," however, Plaintiff did not provide any details.  See Def. Facts at ¶ 92.

On this motion, in support of her gender discrimination claim, Plaintiff describes how she witnessed the harassment of DeLuzio by Scrubb, finding interaction "sexually offensive . . . to hear how Scrubb [spoke to him] in a very explicit manner."  Pl. Affidavit at ¶ 79.  Additionally, Plaintiff asserts that Scrubb said that she

would "deal with Plaintiff 'as women deal with each other'."  Id. at ¶ 75.

Shortly thereafter, Plaintiff took a medical leave of absence from the Family Center for the period from March 20, 2006 through March 31, 2006.  See Def. Facts at ¶ 103.  Plaintiff attributes her medical condition to work-related stress, a decision made after consultation with her physician.  See Pl. Counterstatement at ¶ 103.  Plaintiff returned to work on April 3, 2006, but allegedly became quite ill on her way to the Family Center "because [she] knew [that she] probably was going to have a supervisory meeting" that day.  See Def. Facts at ¶ 104.  As a result, Plaintiff requested that Stover become her supervisor; Stover relayed to Plaintiff that this could not be done based on the decision that supervisors not be changed.  Id. at ¶ 106.

Despite this decision, Plaintiff repeatedly requested a change of supervisor.  Id. at ¶ 107.  Upon the decision by Stover that he could not change her supervisor, Plaintiff, on April 10, 2006, submitted her letter of resignation.  Id. at ¶ 108.  Plaintiff alleges, however, that her resignation was forced due to "the ongoing discrimination, retaliation, harassment and overall hostile work environment which [caused] her severe emotional distress," and that she felt threatened, on a daily basis, that she might be fired.  See Pl. Counterstatement at ¶¶ 109-110.  At no point, however, was Plaintiff told by the Family Center that her position

would be terminated, or that she was in jeopardy. <u>See</u> Def. Facts at ¶ 111. Plaintiff neither applied for nor pursued any other position at the Family Center. <u>See</u> Def. Facts at ¶ 117. Plaintiff further asserts that she resigned due to "continued harassment," at the hands of Scrubb, Boehm, and Grossman, and "unwritten policies that they have already implemented that [Stover] and the board of trustees [sic] have chosen to do nothing about." <u>See</u> Pl. Counterstatement at ¶ 117. Dr. Jones, Plaintiff's physician, concurred with her decision to leave the Family Center, stating in his report, "I felt that it was clear that [Plaintiff's] symptoms were directly related to her work and that she would be best served by seeking employment elsewhere." <u>Id.</u>

<b>PROCEDURAL HISTORY</b>

Plaintiff's Complaint was filed on December 27, 2006. <u>See</u> Def. Facts at ¶ 12. The Complaint contains three (3) counts alleging violations of Title VII (the "Act"), 42 U.S.C. § 2000e, <u>et. seq.</u>: (1) Count One alleges gender discrimination; (2) Count Two alleges reverse race discrimination; and (3) Count Three alleges retaliation. Prior to filing the Complaint, Plaintiff filed a charge with the United States Equal Employment Opportunity Commission, ("EEOC") on or about August 4, 2006. Def.'s Facts at ¶ 15. In the EEOC charge, Plaintiff alleged gender and reverse race discrimination, in addition to retaliation, under Title VII. <u>Id.</u> at ¶ 16. In Paragraph 24 of the EEOC Charge, Plaintiff alleged

-15-

that the basis for the reverse discrimination claim stemmed from working with Scrubb; the gender discrimination claim stemmed from working with both Grossman and Stover.  <u>Id.</u> at ¶ 17.  Plaintiff, in the EEOC Complaint, alleges in Paragraph 4 that Scrubb spoke to Plaintiff "in a degrading and harassing manner based upon her race (white) and sex" and Paragraph 26 "states that the discrimination was based upon race, gender and retaliation."  <u>See</u> Pl. Counterstatement at ¶ 17.  The EEOC dismissed Plaintiff's charge on or about September 12, 2006, because the information supplied was inconclusive to support the claims that Title VII had been violated by the Family Center.  <u>See</u> <u>Id.</u> at ¶ 18. Plaintiff timely filed suit in this Court upon receiving her "Right to Sue" letter from the EEOC.  Plaintiff's Complaint ¶ 4.

**DISCUSSION**

**I.   Summary Judgment Standard**

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 482 n. 1 (3d Cir.2001) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)); <u>accord</u> <u>Fed.R.Civ.P.</u> 56©.  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir.2006); <u>Anderson v.</u>

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir.2002).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Kaucher, 455 F.3d at 423.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F.Supp. 1254, 1258 (D.N.J.1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or ... vague statements...'"  Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs., 982 F.2d 884, 890 (3d Cir.1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir.1991)).

Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56© mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992).

## II.  Title VII

Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 and the Civil Rights Act of 1991, 42 U.S.C. §§ 2000-e et seq., specifically makes it an unlawful employment practice for an employer to discharge any individual because of such individual's sex or race.  See 42 U.S.C. §§ 2000-e, et. seq.  Both private individuals and the EEOC are authorized to enforce Title VII.  However, the EEOC has no direct

powers of enforcement, and therefore may not adjudicate claims or impose administrative sanctions.  Instead, Title VII assigns plenary powers to secure compliance to the federal courts, which have final responsibility for enforcement of Title VII.

Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer:
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin . . .

See 42 U.S.C. § 2000e-2(a).  The statute defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person."  Id. at § 2000e(b).  There is no dispute here that the Family Center is considered an "employer" for purposes of Title VII.

### III.      Count I: Gender Discrimination

Count I of the Complaint asserts that the Family Center discriminated against Plaintiff based on gender.  To prevail on a claim for gender discrimination under Title VII, a plaintiff must establish a prima facie case by showing that (1) she is a member of a protected class; (2) she was qualified for the position she sought to retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.  See Makky v.

Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

The elements of a prima facie case for gender discrimination vary depending on the facts and context of each situation. See Pivirotto v. Innovative Sys., 191 F.3d 344, 352 (3d Cir. 1999). To that end, the Third Circuit has adopted a flexible view of this test, rejecting the requirement that a plaintiff compare herself to a similarly-situated individual from outside her protected class to raise an inference of unlawful discrimination. Sarullo v. United States Postal Serv., 352 F.3d 789, 798 n.7 (3d Cir. 2003); Robinson v. PFPC, Inc., 2010 WL 744191, at *3 (E.D. Pa. Mar. 4, 2010). Importantly, however, a plaintiff "must establish some causal nexus between his membership in a protected class" and the adverse employment decision complained of. Id. In that connection, "an example of a circumstance that can raise an inference of discrimination may be found when a similarly-situated employee outside of the protected class is treated differently from the plaintiff." Robinson, 2010 WL 744191 at *3 (citing Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 602 (M.D. Pa. 2002)). By establishing a prima facie case, the plaintiff creates a "rebuttable presumption that the employer unlawfully discriminated

against" her.  Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 251 (1981).[8]

Defendant first argues that Plaintiff suffered no "adverse employment action sufficient to evoke the protection of Title VII."[9] Jones v. School District, 198 F.3d 403,411 (3d Cir. 1999). The Supreme Court has defined an "adverse" or "tangible" employment action to constitute "a significant change in employment status, such has hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998). Following this reasoning, the Third Circuit has instructed that to support a claim of gender discrimination under Title VII, the adverse action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [her]

---

[8]   Defendant may rebut this presumption by advancing a legitimate nondiscriminatory reason. Fuentes v. Perskie, 32 F.3d 759,763 (3d Cir. 1994). Once the defendant provides a legitimate business reason, the burden shifts back to the plaintiff to prove that the nondiscrminatory explanation is merely a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804. In this case, the Court notes that Defendant does not provide a business reason because it maintains on this motion that Plaintiff was not terminated and that she has failed to establish a prima facie case as to all of her Title VII claims.

[9]    While the parties do not address the first two elements of the prima facie case, the Court finds that Plaintiff satisfies these elements. First, as a woman, Plaintiff is a member of a protected class. Additionally, as the record reflects, and the parties do not dispute, Plaintiff was qualified for the position she held at the Family Center.

of employment opportunities or otherwise adversely affect [her] status as an employee'." <u>Davis v. City of Newark</u>, 285 Fed. Appx. 899, 903-904 (3d Cir. 2008) (quoting <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1296-97 (3d Cir.1997)), <u>abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006) (quoting 42 U.S.C. § 2000e-2(a)(1) and (2)). In that connection,

> an adverse employment action must be one that produces a material employment disadvantage. Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge. Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the prong.

<u>McKinnon v. Gonzales</u>, 642 F. Supp. 2d 410, 435 (D.N.J. 2009)(citations omitted). Furthermore, not every "insult, slight, or unpleasantness gives rise to a valid Title VII claim." <u>Robinson</u>, 120 F.3d at 1297.

Here, Plaintiff maintains that she suffered an adverse employment action because she was constructively discharged by Defendant. To succeed on such a claim, Plaintiff must show that "working conditions were so intolerable that a reasonable person would have felt compelled to resign." <u>Pennsylvania State Police v. Sudes</u>, 542 U.S. 129, 147 (2004); <u>Spencer v. Wal-Mart Stores</u>, Inc. 469 F.3d 311, 317 n.4 (3d Cir. 2006). "[T]he plaintiff must

demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer, 469 F.3d at 317 n.4 (internal quotation and citation omitted). "Intolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign-that is, whether [she] would have had no choice but to resign." Connors v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir. 1998); Clegg v. Falcon Plastics, Inc., 174 Fed. Appx. 18, 27 (3d Cir. 2006). The Third Circuit has stated that constructive discharge can be found "when the employer is aware that the employee has been subjected to a continuous pattern of harassment and the employer does nothing to stop it." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084-84 (3d Cir. 1996) (discussed in Duffy v. Paper Magic Group, 265 F.3d 163 (3d Cir. 2001)).

Examples of situations that the Third Circuit has identified as constituting constructive discharge are: (1) the threat of discharge; (2) an urge or suggestion that an employee either resign or retire; (3) employee is demoted; (4) change in job responsibilities; (6) evaluations deeming performance "unsatisfactory;" and/or (7) whether the employee requested a transfer to another position. See Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1161 (3d Cir. 1993). Although the factors enumerated in Clowes are neither absolute nor

-23-

comprehensive, the Third Circuit and other district courts have affirmed summary judgment in instances where a plaintiff has failed to demonstrate one or more of those factors. See, e.g., Clegg v. Falcon Plastics, Inc., et al., 174 Fed. Appx. 18, 27 (3d Cir. 2006); Duffy, 265 F.3d at 168; Ferguson v. Deptford Twp., 2008 U.S. Dist. LEXIS 105144, at *18-19 (D.N.J. Dec. 22, 2008); Vanartsdalen v. Twp. of Evesham, 2007 U.S. Dist. LEXIS 55859, at *11-16 (D.N.J. Aug. 2, 2007).

In the present case, to support her constructive discharge claim, Plaintiff contends that Scrubb's constant harassing and discriminating conduct led to her deteriorating health condition, which ultimately forced her to resign. To sum up the harassing conduct, Plaintiff alleges, inter alia, that Scrubb repeatedly berated her and spoke to her in a condescending manner, cancelled scheduled training, discredited Plaintiff's work, and placed Plaintiff on a call back up for the Crisis Intervention Unit which required her to work either a Friday night or Saturday. However, when applying the factors set forth in Clowes or any other possibly relevant factors, Plaintiff has failed to present sufficient evidence to show that she was constructively discharged.

Plaintiff was not told by Scrubb or management in the Family Center to resign from her position. See Plaintiff's Dep., 265; Def. Facts at ¶ 109. In fact, the record reflects that Plaintiff resigned from her position after an independent consultation with

-24-

her private physician.   See Id.   Furthermore, throughout Plaintiff's employment with the Family Center, she neither suffered a reduction of pay or benefits, nor was she demoted from her position.   See Plaintiff's Dep., 265-66.   Additionally, at no time during her employment did Plaintiff receive a poor evaluation from management, nor was she transferred to a less desirable unit.   Id. Moreover, while Plaintiff suggests she sought other positions at the Family Center, Plaintiff testified that her search was in the form of a general inquiry.   See Id. at 267-268 (Plaintiff "talked a couple of times about things in Family Guidance").   The only position Plaintiff specifically discussed was the position of the Coordinator in the Crisis Unit.   See Id. at 268.   However, at the time Plaintiff discussed that position with Boehm, it was already being held by Scrubb.   See Id.   Thus, prior to her resignation, Plaintiff neither applied for nor pursued another position at the Family Center.   Id. at 269.   At best, she requested that she be supervised by another individual or alternatively, that Scrubb be terminated.

Contrary to Plaintiff's suggestion that she was constructively discharged, in applying all reasonable inferences in favor of Plaintiff, the Court nonetheless finds that Plaintiff's work environment, at best, may have been stressful.   In that regard, Scrubb may have made Plaintiff's work more difficult by her allegedly crude mannerisms, but she did not render Plaintiff's job

impossible.  Indeed, employees across-the-board are not guaranteed stress-free working environments.  See Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992) ("Employees are not guaranteed stress-free environments and discrimination laws cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting); Duffy, 265 F.3d at 169; Mankowski v. PSEG Servs. Corp., 2005 U.S. Dist. LEXIS 30242, at *39-40 (D.N.J. Nov., 29, 2005) (plaintiff's allegations of "repetitious questioning during staff meetings and assignment of tasks to be beneath Plaintiff's position" did not support constructive discharge claim).  Similarly, here, while Plaintiff was required to be on-call for the Crisis Intervention Unit which required her to work either a Friday night or Saturday, her work responsibilities did not significantly change, nor was she ever assigned degrading or menial tasks.  While Plaintiff maintains that she "felt everyday that she might be fired [and was] threatened on a continuing basis," she does not point to any evidence of such threat, but rather Plaintiff concluded that the actions of Scrubb were threatening in nature.  On this issue, Plaintiff's deposition testimony reveals the subjective nature of her belief:

> Q.   Anybody ever suggest or encourage you to quit?
>
> * * *
>
> A.   Verbally, I wasn't being told that, but by all the things that they were demanding, and when I would ask them about those things, they told me this was the way it was, and

> if I didn't like it – that certainly led me to believe that I was going to [be] fired at any moment.

Plaintiff's Dep., 265-66.

In that regard, without any evidence of threats, the proper inquiry is whether a reasonable person in Evans' position would have felt that the alleged circumstances were too onerous to bear and rendered the working conditions objectively intolerable. Duffy, 265 F.3d at 169. Giving Plaintiff all favorable inferences, the record does not support such a finding. Finally, while Plaintiff resigned from her employment due to health reasons allegedly stemming from her working conditions, that fact alone – a stressful environment – does not sufficiently satisfy a finding of constructive discharge. See Id. at 170 (concluding that Plaintiff's physician's opinion that job impacted her health supported only an inference of a stressful environment, which "does not amount to constructive discharge").

Even assuming, arguendo, that Plaintiff could demonstrate that an adverse employment action was taken against her in form of her constructive discharge, nonetheless, she fails to show it was the result of intentional discrimination. In that regard, Plaintiff fails to establish a causal nexus between her "membership in [the] protected class" and "the adverse employment decision complained of." Sarullo, 352 F.3d at 798. In fact, Plaintiff's own Affidavit, and the Complaint in this case, are based on allegations

-27-

regarding discriminatory conduct against her <u>and</u> DeLuzio, her male co-worker.  Both DeLuzio and Plaintiff complained to management about the alleged actions of Scrubb.  Tellingly, Plaintiff's numerous memoranda documenting certain actions of management between October 2005 and March 2006 contained no information about gender discrimination, except for Plaintiff's March 13, 2006 memorandum.  <u>See</u> Memo dated March 3, 2006.  However, in that memorandum, Plaintiff identified the gender discrimination to be based upon alleged actions taken against DeLuzio – not Evans – by Scrubb and Boehm.  <u>See</u> <u>Id.</u> at ¶ 2("We clarified during the meeting which you (Grossman) made light of, that we had mistakenly used an incorrect term 'sexual harassment' in describing sex/gender discrimination/harassment pertaining to FCIU clinician Michael DeLuzio in reference to how he was treated by both Ms. Scrubb and Ms. Boehm"); Plaintiff's Dep., 189-192; Defendants' Statements, ¶ 90.

Moreover, Plaintiff's deposition testimony was replete with vague statements lacking specificity regarding the gender discrimination allegations that specifically pertained to her.  <u>See</u> Plaintiff's Dep. 189-192.  Plaintiff testified:

> Q.   The sexual harassment was used erroneously because what you really meant to say was sex gender discrimination harassment, correct?
>
> A.   Yes.
>
> Q.   But this says it relates to only to FCIU Clinician,

Michael DeLuzio.  Isn't that what that says?

A.   On this memo pertaining to a certain incident, yes.

Q.   Ma'am, where does it say sex or gender discrimination
     against Jane Evans, and this is what it is with an
     explanation, detail or basis?  Tell me where, anywhere?

A.   We're talking about this memo?

Q.   Anywhere.

A.   Other than this memo right now, I can't refer to anything
     else.

* * *

Q.   Did you ever take it upon yourself to write what was done
     to Jane Evans that was sex or gender discrimination?

A.   We had several references in all kinds of different memos
     that addressed different things.

Q.   I understand all those vague statements, ma'am.  I'm
     asking what you did to explain that, if anything?

A.   Throughout all the different memos there were several
     references to different things I don't remember
     everything at this time.

Plaintiff's Dep., 191-192.

In that connection, even viewing the facts in the light most
favorable to Plaintiff, the record shows that Plaintiff has not
provided an example of any male who received more favorable
workplace treatment than she, or any specific evidence – other than
vague conclusory statements – that she made any objections to the
Family Center that she was treated less favorably than a male co-

-29-

worker.[10]  Accordingly, Plaintiff has failed to show a casual nexus between her gender and the alleged adverse employment action. <u>See</u>, <u>e.g.</u>, <u>Brown v. Hamot Med. Ctr.</u>, 2009 U.S. App. LEXIS 6466 (3d Cir. Mar. 26, 2009) (affirming summary judgment on female plaintiff's Title VII gender discrimination claim based on the lack of evidence that a male "was treated more favorably than she"); <u>see also</u> <u>Wooler v. Citizens Bank</u>, 2008 U.S. App. LEXIS 6999 (3d Cir. Apr. 2, 2008)(affirming summary judgment dismissal of gender discrimination claim because plaintiff failed to provide "evidence that similarly situated males were treated differently" or any "other evidence sufficient to give rise to an inference of discrimination" to establish a <u>prima</u> <u>facie</u> case); <u>Robinson</u>, 2010 WL 744191 at *6. Therefore, Plaintiff's claim of gender discrimination is dismissed because she has failed to establish a <u>prima</u> <u>facie</u> case.

## IV.  Count Two:  Retaliation

To establish a <u>prima</u> <u>facie</u> case of discriminatory retaliation under Title VII, a plaintiff must demonstrate that she (1) engaged in protected activity; (2) that the employer took adverse action against her; and (3) that there is a causal connection between the

---

[10]     In Plaintiff's EEOC charge, she alleged that her gender discrimination claim is related to the actions of Grossman and Stover.  On this motion, Plaintiff has failed to point to any evidence of gender discrimination by Stover or Grossman; in fact, Plaintiff has admitted that she had requested that Stover be her supervisor.  <u>See</u> Plaintiff's Interrogatory, ¶ 11.  Rather, Plaintiff focuses her gender discrimination claim here on the actions of Scrubb.

protected activity and the adverse action.  See Neiderlander v.
American Video Glass Company, 80 Fed. Appx. 256, 260 (3d Cir. 2003)
(citing Goosby v. Johnson & Johnson Medical Inc., 228 F.3d 313, 323
(3d Cir. 2000); Nelson v. Upsala College, 51 F.3d 383,386 (3d Cir.
1995).  A plaintiff may establish the requisite causal connection
by showing a close temporal proximity between the protected
activity and the alleged retaliatory conduct, or by identifying
"circumstantial evidence . . . that give[s] rise to an inference of
causation." Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302
(3d Cir. 2007).  Similar to her gender discrimination claim,
Plaintiff does not meet all three prongs necessary to establish a
prima facie claim of retaliation.

     As to the first element of the claim, Defendant argues that
Plaintiff did not engage in protected activity under Title VII as
her complaints centered on workplace conditions that were wholly
unrelated to discrimination.  "With respect to 'protected
activity,' the anti-retaliation provision of Title VII protects
those who participate in certain Title VII proceedings . . . and
those who oppose discrimination made unlawful by Title VII . . . ."
Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006);
Ferra v. Potter, 324 Fed. Appx. 189, 192 (3d Cir. 2009).  In other
words, in order to succeed on a Title VII retaliation claim, an
employee must have an "objectively reasonable" belief that the
activity she opposes constitutes unlawful discrimination under

Title VII. See Wilkerson v. New Media Tech. Charter Sch., 522 F.3d 315, 322 (3d Cir. 2008). Opposition to unlawful employment practices takes many forms, including "complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Sumner v. United States Postal Service, 899 F.2d 203, 209 (3d Cir. 1990). A plaintiff alleging retaliation must show "some form of opposition, which is communicated to the employer, followed by an adverse action by the employer." Neiderlander, 80 Fed. Appx. at 260.

Here, viewing the facts in the light most favorable to Plaintiff, Evans fails to establish that the alleged discriminatory conduct she complained about is protected under Title VII. In fact, Plaintiff's complaints cannot be objectively viewed as activities protected under Title VII because these complaints were generally in the nature of the way Scrubb spoke to, and treated, her. For example, Plaintiff stated numerous times in her memoranda that Scrubb talked to her "slowly and deliberately as you would to a child;" that Scrubb allegedly talked "very, very fast and it was hard to understand what she was saying;" and that once Scrubb allegedly said that she needed case charges and "clapped her hands" for them to be retrieved. Plaintiff also complained about having to be on-call on Friday nights and Saturdays. These complaints were not specifically tied to any discriminatory practices. Thus,

Plaintiff was asked on separate occasions by upper management and the Grievance Committee to provide an explanation or to detail the "discrimination" first alleged in the January 9, 2006 memorandum to Grossman.  However, Plaintiff did not provide any details.  See Plaintiff's Dep., 180-181.  Although for the first time in the March 13, 2006 memo, Plaintiff referenced a "reverse race discrimination" claim against Scrubb, Plaintiff only generally allege that Scrubb treated people "differently," but could not provide details or facts to explain the alleged disparate treatment.  Id. at 192-195.

Having reviewed Plaintiff's memoranda and the allegations contain therein, no reasonable person could have believed that the conduct about which Plaintiff's complained violated Title VII.  See Ferra, 324 Fed. Appx. at 192 (affirming summary judgment on retaliation claim because employee's numerous grievances and complaints "were not aimed at opposing practices made unlawful by Title VII"); Fleeger v. Principi, 2007 U.S. App. LEXIS 5477, at *8-9 (3d Cir. Mar. 7, 2007); Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995)(plaintiff employee's general letter complaining about unfair treatment at work, but failing to explicitly or implicitly allege age discrimination, was not protected activity).

Even assuming Plaintiff can demonstrate that she engaged in protected activities, Plaintiff nevertheless fails to establish

that Defendant took any adverse action against her for complaining about Scrubb's conduct.  In that regard, Defendant argues that because Plaintiff neither suffered an adverse employment action nor constructive discharge, she cannot satisfy the second element – an adverse action – of her retaliation claim.  Indeed, to show that Defendant took an adverse employment action against Plaintiff in the context of a retaliation claim, Plaintiff must show "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Moore, 461 F.3d at 341 (citing White, 548 U.S. 53 (2006)).  In evaluating whether these actions are "materially adverse," the Third Circuit has instructed that the court must "remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience'."  Moore, 461 F.3d at 346.  Therefore, complaints of "micromanaging," "increased scrutiny," and "reprimands about plaintiff's lateness," would not rise to the level of materially adverse actions.  McKinnon, 642 F. Supp. 2d at 426 (citations omitted).

While this standard requires less stringent showing of an adverse action than in the context of a discrimination claim,

Plaintiff, similarly, has not demonstrated that Defendant took any retaliatory action against her that was materially adverse; in fact, the record shows the contrary.  The record clearly shows that despite the allegedly "adverse actions" taken by Scrubb or other management members, Plaintiff continued to report and document alleged "incidents" of unfair working environment.  In response to Plaintiff's complaints, Defendant addressed Plaintiff's concerns by holding numerous meetings to discuss her memoranda and the Grievance Committee also investigated Plaintiff's allegations. More importantly, no reasonable trier of fact would find the complained of actions taken by Scrubb, i.e., the degrading way Scrubb spoke to, and treated, Evans and increased Plaintiff's workload, as a result of complaining to upper management were adverse, because, at worst, Scrubb's actions constituted "increased scrutiny" and "micromanaging" of Plaintiff's work – which are not actionable.  See McKinnon, 642 F. Supp. 2d at 426.  Therefore, the Court finds Plaintiff has failed to show that any retaliatory action was taken against her.[11]  See, e.g., Trujillo v. University of Colorado Health Sciences Center, 157 F.3d 1211, 1214 (10th Cir. 1998)("federal law does not guarantee a utopian workplace, or even a pleasant one")(internal quotation and citations omitted);

---

[11]     Clearly, since Plaintiff has failed to show that there was any adverse employment action taken against her, she cannot demonstrate the last element - whether there is a casual connection between the protected activity and the adverse action.

Hartsell v. Duplex Products, Inc., 123 F.3d 766, 773 (4th Cir. 1997)("Title VII does not guarantee a happy workplace, only one free from unlawful discrimination"); Sparrock v. NYP Holdings, Inc., 2008 WL 744733 at *3 (S.D.N.Y. 2008)(finding that "micromanaging" is just a "minor irritant of everyday life and business); Scafidi v. Baldwin Union Free School Dist., 295 F. Supp. 2D 235, 239 (E.D.N.Y. 2003)(where the court deemed it "well settled that '[t]o qualify as an adverse employment action, excessive scrutiny must be accompanied by unfavorable consequences'"); Castro v. New York City Bd. Of Educ. Personnel, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998)(stating that "although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alternatives of employment conditions").

Accordingly, Plaintiff has failed to establish a prima facie case for her retaliation claim, and therefore, it is dismissed.

## V.    Count Three:  Reverse- Race Discrimination

Plaintiff asserts that, in addition to being subjected to gender discrimination and retaliatory conduct, she also suffered reverse-race discrimination.  Defendant contests that Plaintiff has failed to prove such a claim, and the claim is solely premised on the fact that her direct supervisor, Scrubb, was an African American woman.

In order to establish a prima facie case of reverse race

discrimination under the McDonnell Douglas burden-shifting framework, Plaintiff must present "sufficient evidence to allow a fact-finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." See Idiamarco v. Runyon, 190 F.3d 151, 161 (3d Cir. 1999). This is an initial burden. Hunter v. Rowan University, 299 Fed. Appx. 190, 194 (3d Cir. 2008). If Plaintiff meets this burden, the elements of her prima facie case are then considered. Id. Plaintiff must then show that: (1) she was qualified for the position that she held; (2) despite her qualifications, she was terminated by her employer; and (3) Plaintiff presented sufficient evidence to allow a reasonable fact-finder to conclude, given the totality of the circumstances, that the employer treated Plaintiff less favorably because of her race.[12] Mosca v. Cole, 384 F. Supp. 2d 757, 765 (D.N.J. 2005).

In the present matter, Plaintiff has failed to meet her initial burden. As the record reflects, Plaintiff has not presented evidence that establishes that Defendant treated her in a manner that was less favorable than that afforded to other non-Caucasian employees. The Court's analysis starts with Plaintiff's memoranda. While there were numerous written complaints made to upper management regarding Scrubb's unprofessional conduct,

---

[12]     This Court notes that the initial burden set forth by Idiamarco is identical to the third element of Plaintiff's prima facie case for reverse-race discrimination.

allegations of race discrimination were not included among them. Specifically, when Plaintiff first complained about Scrubb to Stover on October 5, 2005, she did not allege that Scrubb was discriminating because of her race. See Plaintiff's Interrogatory Answer Num. 11, p. 10. Plaintiff then initiated a grievance with DeLuzio against Scrubb on October 25, 2005, because of alleged "personal and professional reasons." Id. at p. 11. Even upon meeting with Grossman and Boehm on November 7, 2005, Plaintiff did not specify that allegations against Scrubb at that time were predicated on race, but those complaints were rather general disagreements regarding Scrubb's intense "level of animosity"; "critical and non-supportive" direction; and harsh intonation of speech. See Pl. Counterstatement at ¶¶ 60, 63-66, 68. Furthermore, following further complaints about Scrubb's managing style, Plaintiff was afforded an opportunity by the Grievance Committee to detail specific instances of discrimination for purposes of clarifying the ambiguous complaints regarding Scrubb. As the record shows, the summary Plaintiff submitted in response to the Grievance Committee did not mention any instances of racial discrimination. See Pl. Counterstatement at ¶ 79 (Plaintiff admits to referencing "inappropriate verbal communication" that was allegedly "discriminatory"). Indeed, January 9, 2006 was when the first allegation of "discrimination" was raised. Importantly, of all the complaints filed, only one alludes to a possible claim of

-38-

racial discrimination: through a memorandum submitted to Grossman on March 13, 2006, Plaintiff asserted, without detail, that "Michelle Scrubb (who is black) would routinely treated [sic] us as lesser than [sic] . . . ." Id. at ¶ 90.

However, admittedly, Plaintiff has not been able to provide details on how she was treated less favorably than a non-Caucasian employee, and she has testified that she knows of no document she authored containing that information despite all of the memoranda she wrote during her employment at the Family Center.  In her deposition, Plaintiff was asked, numerous times, to identify any African American employee whom she believed to have received more favorable treatment or how any of the rule changes were discriminatory in nature – Plaintiff failed to do so.  See Plaintiff's Dep., 189-192; 94-95; 96-97.  Plaintiff testified as follows:

> Q.  What rules did Miss Scrubb make?
>
> A.  We had to have different things.  We would have the supervisory meetings, and she wouldn't show up for them, and when she wouldn't show up for them, we would you know, call her and say you didn't show up for your meeting, when are we going to schedule another meeting? She wouldn't get back to us, and then when she would get back to us, she would say we never had anything scheduled.  So she would make up different rules like I'm going to call and to tell you when your meeting is and you need to be there . . . .
>
> * * *
>
> Q.  Any other rules that you can recall Miss Scrubb making?
>
> A.  There were a lot of them.  I can't recall all of them at

-39-

this time.

Q.   As you sit here right now, you can't tell me any other
     rule about [sic] when and how to go about scheduling a
     meeting?

A.   Some of it was the rules, some of it was how she talked
     to us, how she spoke to us in a very nasty manner.  She
     would yell at us.  So there was a lot of grievance things
     that we were upset about.

     * * *

Q.   What is different with what's going on with you and Mr.
     DeLuzio as compared to what you say is going on outside
     of your realm?

A.   I don't know what [Ms. Scrubb] was doing outside of that
     realm.  I can only speak from what she was doing with me
     or myself, you know.

Q.   What was different?

A.   In the sense that she would schedule meetings.  I'm
     assuming she would schedule meetings with other people
     and keep them.

Q.   You can't tell me anything that you know for a fact that
     was different with what [Ms. Scrubb] did with you and
     what she did with anybody else, isn't that true?

     * * *

A.   I don't really remember anything at this time.

Plaintiff's Dep, 94-95; 96-97.  Additionally, Plaintiff was asked

at her deposition to identify any and all African American co-

employees that she claimed were relevant to this case, which she

could not do.  See Id. at 21-23.  Clearly, Plaintiff's testimony,

and indeed, the record, lack the necessary evidentiary basis to

allow a fact-finder to conclude that Defendant was treating some

people less favorably than others based upon race.

Attempting to cure her vague deposition testimony and defeat summary judgment, Plaintiff relies on her Affidavit in support of her Opposition to summary judgment, to illustrate Defendant's disparate treatment. There, Plaintiff identifies Tony Wilson, an African American, as the recipient of favorable treatment by Scrubb. In that respect, Plaintiff also declares, for the first time in this litigation, after discovery has long ended, that she was able to observe Scrubb's "interaction and behavior around an African American secretary while in the main office of the Family Guidance Center," and "Tony Wilson, an African American, who worked in the crisis unit." See Plaintiff's Aff., ¶ 85.[13]

In support of her last-minute effort to defeat Defendant's motion, Plaintiff relies on an affidavit of a former Caucasian co-worker, Vincent Bocina, who claims that Wilson was treated more favorably by Scrubb allegedly because Wilson is African American. See Bocina Affidavit at ¶¶ 38-46. Bocina was not identified by

---

[13]    Defendant contends that Plaintiff's Affidavit in this regard should be disregarded pursuant to the "sham affidavit" doctrine. Defendant reasons that because Plaintiff has failed to identify any African American employee that she believed received better treatment than she after having been asked numerous times throughout this litigation prior to this summary judgment motion, Plaintiff's Affidavit should be disregarded as a "sham." While the Court questions Plaintiff's belated assertions in her Affidavit regarding Wilson, these statements do not directly contradict her prior testimony. However, as will be discussed further in the proceeding section of this Opinion, Plaintiff's statements regarding Wilson are insufficient to raise a triable issue of fact as to whether Scrubb treated Evans less favorably than other non-Caucasian employees.

Plaintiff at any earlier stage in this litigation as someone with relevant knowledge.  It is important to note that since Plaintiff has not provided this information during discovery prior to the filing of this motion, and has failed to provide a reason as to the timing of these affidavits, the Court could disregard them on this motion.  See Mitchael v. Intracorp, Inc., 179 F.3d 847, 855 (10th Cir. 1999)(district court properly excluded Plaintiff's affidavit opposing summary judgment submitted after discovery has closed because its submission "represented an attempt to create a sham issue of fact" and "plaintiffs were deliberately sandbagging defendants"); Juarez v. Utah, 263 Fed. Appx. 726, 735 (10th Cir. 2008) (district court properly excluded Plaintiff's affidavit opposing summary judgment even though affidavit did not directly contradict prior testimony, because the timing of the affidavit "places the defendant at a disadvantage, depriving [defendant] of any chance to pursue discovery on the subjects covered in the affidavit"); see also Machin v. Leo Burnett,Inc., 376 F.Supp.2d 188, 200 (D.P.R. 2005) (timing of an affidavit recanting prior testimony, i.e. in response to a summary judgment request, is "crucial" in determining the sufficiency of an affidavit); Saudi v. S/T Marine Atlantic, 159 F.Supp.2d 512, 521 (S.D. Tex. 2001)(the court struck an affidavit in response to summary judgment because considering it would greatly prejudice the defendants).

 While it is a close call whether Bocina's Affidavit should be

disregarded, as well as Plaintiff's related statements articulated for the first time in her Affidavit in this matter, nonetheless, such a finding is of no moment because even considering Bocina's Affidavit and Plaintiff's statements, they fall short of raising a genuine issue of material fact that Scrubb was treating some people favorably because of their race. In his Affidavit, Bocina declares that Scrubb treated Wilson "way more favorably than any other employee." Id. at ¶ 39 (emphasis added), and that Scrubb hired Wilson without any mental health experience and covered for Wilson when he failed certain testing required by the Family Center. Id. at ¶¶ 41-45. Other than these cursory statements regarding Wilson, Bocina's other statements regarding generally about certain "unethical things" that employees were required to perform, or that Scrubb was not qualified to perform her job, are not relevant to the issue whether Scrubb treated African Americans more favorably than their Caucasian counterparts. There are no specific claims relating to how Wilson was treated differently or otherwise had more favorable rules applied to him than the ones applicable to Plaintiff or any other Caucasian employees. In fact, Bocina stated that in and around March 2006, all employees – African American and Caucasian employees alike – in the crisis unit were given a raise with substantial back pay and a one time bonus; however, Plaintiff and DeLuzio were excluded. Seemingly, that would support Plaintiff's claim that she and DeLuzio were treated differently –

but not because of race. Indeed, as a Caucasian employee, Bocina's receipt of this pay adjustment contradicts Plaintiff's claim that Caucasian workers were treated differently than non-Caucasian employees.  Thus, Bocina's Affidavit and Plaintiff's own self-serving, conclusory statements regarding Wilson are insufficient to raise an issue of fact on this motion. See, e.g., Watson v. Eastman Kodak Co., 235 F.3d 851, 857 (3d Cir. 2000)(Plaintiff, who bears the ultimate burden of demonstrating a prima facie case of discrimination cannot rely on her own deposition testimony to establish that she was treated unfavorably as compared to other employees).

Indeed, viewing the facts in the light most favorable to Plaintiff, the "incidents" of discrimination alleged by Plaintiff are insufficient to raise an issue of material fact with respect to whether Defendant treated Plaintiff less favorably than others based on race.  Accordingly, the Court concludes that Plaintiff has not produced competent evidence to meet her initial burden to establish a prima facie case of reverse-race discrimination claim. As a result of not meeting this initial burden, it is unnecessary to discuss the first two required elements necessary to establish a prima facie case of race-discrimination.  Consequently, Count III is dismissed.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted in its entirety.


Dated:  March 30, 2010

                              s/ Freda L. Wolfson
                              Freda. L. Wolfson, U.S.D.J.